IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LUIS CARDENAS OROSCO,

               Petitioner,          No. CIV S-08-3075-JAM-TJB

     vs.

D. K. SISTO,

               Respondent.    <u>ORDER, FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner Luis Cardenas Orosco is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, (1) Petitioner's request for judicial notice is granted; (2) Petitioner's remaining requests are denied; and (3) it is recommended that the habeas petition be denied.

## II.  PROCEDURAL HISTORY

On November 22, 2005, Petitioner was convicted of second degree murder, five counts of attempted murder, and one count of first degree burglary in Sacramento County Superior Court. *See* Clerk's Tr. vol. 4, 991-96; *see also* Lodged Doc. 4, at 1.  "The jury also found true allegations that [Petitioner] used a dangerous and deadly weapon in the commission of the murder and attempted murders (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury

1

in the commission of the attempted murders (§ 12022.7, subd. (a)).”  Lodged Doc. 4, at 1.

Petitioner was sentenced to forty-three years to life in prison.  *Id.*; *see* Clerk’s Tr. vol. 4, 997-

1000.

Petitioner directly appealed to the California Court of Appeal, Third Appellate District.

*See* Lodged Doc. 1.  On June 22, 2007, the Court of Appeal issued a reasoned decision affirming

the conviction.  *See* Lodged Doc. 4.

Petitioner filed a petition for review in the California Supreme Court.  *See* Lodged Doc.

5.  On August 29, 2007, the California Supreme Court denied the petition without comment or

citation.  *See* Lodged Doc. 6.

On December 3, 2008, Petitioner filed the instant federal habeas petition in the United

States District Court for Central District of California.  *See* Pet’r’s Pet., ECF Doc. 1.  On

December 16, 2008, the district court transferred the matter to the United States District Court

for the Eastern District of California.  *See* Order, Dec. 16, 2008, ECF No. 3.  On October 2,

2009, Respondent filed an answer, to which Petitioner filed a traverse on December 15, 2009.

### III.  FACTUAL BACKGROUND[1]

The facts of the underlying offenses are immaterial to our
determination of this appeal.  The facts surrounding [Petitioner’s]
statement to law enforcement, however, are material and are given
below.

On August 7, 2004, [Petitioner] was taken into custody near the
scene of the crimes and transported to the Sacramento County
Sheriff’s Department for questioning.  [Petitioner] was questioned
by Detective Dan Cabral, who speaks both English and Spanish.
Cabral was asked to interview [Petitioner] by Sergeant Craig Hill,
who “had some difficulty understanding [Petitioner] and wanted to
make sure . . . that somebody was available to [Petitioner] if, in
fact, [Petitioner] wanted to speak in Spanish.”

---

[1] These facts are from the California Court of Appeal’s opinion issued on June 22, 2007.
*See* Lodged Doc. 4, at 2-6.  Pursuant to the Antiterrorism and Effective Death Penalty Act of
1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts
that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v.
Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.
2004).

Before questioning [Petitioner] about the crimes, Cabral conversed with [Petitioner] in English.  He asked [Petitioner] if he wanted some water, and [Petitioner] said, "Please, water."  When Cabral noted that [Petitioner] had already been given some water, [Petitioner] stated, "No.  I need more, man."  Cabral told [Petitioner] that he would get [Petitioner] a new cup, and [Petitioner] said, "Thanks, man."  Cabral asked [Petitioner] if [Petitioner] understood "English pretty good," and [Petitioner] said, "Yeah."  Cabral told [Petitioner] that "[i]f there's something you don't understand, let me know so I -- we can make it clear so you understand me," and [Petitioner] responded, "Okay."  Cabral then explained, "I do speak Spanish.  However, I understand better than I can speak it."  [Petitioner] responded, "I understand, man." [Petitioner] then asked Cabral, "You the lawyer?  Something?" Cabral said, "No," and explained he was a detective.  Cabral then asked [Petitioner] whether he understood that he was under arrest, and [Petitioner] responded, "Uh-huh."

After this initial colloquy, Cabral advised [Petitioner] of his *Miranda*[2] rights by reading from a standard form in English.  When Cabral finished, he asked [Petitioner]:  "Do you understand each of these rights that I have explained to you?"  According to the transcript of the interview, there was "[n]o [a]udible [r]esponse." Cabral then asked [Petitioner], "Yes or no," and [Petitioner] responded, "Yes."  Cabral then asked [Petitioner]:  "Having these rights in mind, do you wish to talk to me?"  Again, the transcript reads, "[n]o [a]udible [r]esponse."  Cabral then asked, "That's yes or no," and [Petitioner] replied, "Yeah.  Yes."

Shortly thereafter, [Petitioner] and Cabral began conversing primarily in Spanish.  During the interview, [Petitioner] made inculpatory statements admitting he had assaulted each of the victims.

[Petitioner] moved to suppress his statement to Cabral on the ground it was obtained involuntarily and in violation of his *Miranda* rights.  He claimed he "could not have knowingly and intelligently waived his right to remain silent because he was not advised of his *Miranda* rights in his native language; he did not sign a written *Miranda* waiver; and he did not appear to understand his *Miranda* rights."

The trial court held an evidentiary hearing on [Petitioner's] suppression motion.  Detective Cabral testified that [Petitioner] "[d]efinitely" appeared to understand him when he "communicated to [Petitioner] in English," including when he read [Petitioner] his *Miranda* rights.  Cabral explained that had [Petitioner] appeared not to have understood his rights, Cabral would have read him his

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

3

rights in Spanish.

Three Sacramento County Sheriff's deputies, each of whom had prior contact with [Petitioner], also testified. Deputy Daniel Davis, who did not speak Spanish, testified that in 1999 he responded to a "suspicious circumstances call" and encountered [Petitioner]. Davis asked [Petitioner] in English what he was doing there, and [Petitioner] explained in English that his car had broken down and he was fixing it. [Petitioner] later admitted that he was changing his transmission fluid and allowing it to run into the storm drain. Davis read [Petitioner] his *Miranda* rights in English, and [Petitioner] indicated he understood those rights and agreed to waive them. According to Davis, [Petitioner] had a "thick accent" and "[h]is speech was very deliberate"; however, [Petitioner] "didn't have any problem communicating with [Davis] whatsoever."

Deputy Jeffrey Farley, who also did not speak Spanish, testified that in 2002 he detained [Petitioner] on suspicion of attempting to pass a forged check. Farley advised [Petitioner] of his *Miranda* rights in English, and thereafter, [Petitioner] agreed to speak to him. [Petitioner] explained in English that he received two checks from a third party and was to cash them, give the proceeds from one of the checks to the third party, and keep the proceeds from the other check for himself. [Petitioner] provided a physical description of the third party and gave Farley a couple of places to look for her. At the jail, [Petitioner] was given a "*Miranda* sheet" written in English. When [Petitioner] explained that he could not read English, Farley turned the sheet over so that [Petitioner] could read it in Spanish.

Deputy Earl Helfrich, who spoke both English and Spanish, testified that in 2003 he responded to a report of an intoxicated man and encountered [Petitioner]. Helfrich advised [Petitioner] of his *Miranda* rights in Spanish, and [Petitioner] indicated he understood his rights and agreed to speak to Helfrich. Helfrich took a statement from [Petitioner] but could not recall whether the two conversed in English, Spanish, or both.

The trial court denied [Petitioner's] motion to suppress. The court determined his statements were "freely and voluntarily given and should be admitted. Although [Petitioner] speaks mostly Spanish, he clearly understood the admonitions and questions put to him in both Spanish and English by Detective Cabral and others. [Petitioner] understood and voluntarily waived his *Miranda* rights."

A redacted videotape of the interview was played for the jury.

4

1  IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

2        An application for writ of habeas corpus by a person in custody under judgment of a state

3  court can be granted only for violations of the Constitution or laws of the United States.  28

4  U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

5  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

6  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

7  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

8  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

9  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

10  state court proceedings unless the state court's adjudication of the claim:

11        (1) resulted in a decision that was contrary to, or involved an
      unreasonable application of, clearly established Federal law, as
12        determined by the Supreme Court of the United States; or

13        (2) resulted in a decision that was based on an unreasonable
      determination of the facts in light of the evidence presented in the
14        State court proceeding.

15  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

16  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

17        In applying AEDPA's standards, the federal court must "identify the state court decision

18  that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

19  "The relevant state court determination for purposes of AEDPA review is the last reasoned state

20  court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

21  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

22  orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v.*

23  *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

24  must conduct an independent review of the record to determine whether the state court clearly

25  erred in its application of controlling federal law, and whether the state court's decision was

26  objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

5

1    question under AEDPA is not whether a federal court believes the state court's determination

2    was incorrect but whether that determination was unreasonable--a substantially higher

3    threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

4    "When it is clear, however, that the state court has not decided an issue, we review that question

5    *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

6    545 U.S. 374, 377 (2005)).

7    V.  REQUESTS FOR REVIEW

8        The petition for writ of habeas corpus sets forth four requests.  Petitioner requests:  (1)

9    judicial notice; (2) an order to show cause; (3) an evidentiary hearing in the Superior Court; and

10   (4) appointment of counsel.  *See* Pet'r's Pet. 16.

11       A.  First Request:  Judicial Notice

12       First, Petitioner requests "judicial notice of the record in <u>People v. Luis Cardenas Orosco</u>,

13   Superior Court Case No. 04F06886, Court of Appeal Case No. C051676, and California

14   Supreme Court Case No. S153939."  Pet'r's Pet. 16.

15       "A judicially noticed fact must be one not subject to reasonable dispute in that it is either

16   (1) generally known within the territorial jurisdiction of the trial court[;] or (2) capable of

17   accurate and ready determination by resort to sources whose accuracy cannot reasonably be

18   questioned."  FED. R. EVID. 201(b); *see United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th

19   Cir. 1993).  "A court shall take judicial notice if requested by a party and supplied with the

20   necessary information."  FED. R. EVID. 201(d).  The record of a state court proceeding is a source

21   whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court

22   records.  *Mullis v. U.S. Bankruptcy Court*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987), *cert. denied*,

23   486 U.S. 1040 (1988); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978),

24   *aff'd*, 645 F.2d 699 (9th Cir. 1981), *cert. denied*, 454 U.S. 1126 (1981); *see also Colonial Penn*

25   *Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*,

26   615 F.2d 736, 738 (6th Cir. 1980).

6

Petitioner's request for judicial notice of the record in the state court proceedings is granted. Fed. R. Evid. 201(b)(2), (c); *see also*, *e.g.*, *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 n.5 (9th Cir. 1995) (upholding judicial notice of orders and decisions by other courts), *rev'd on other grounds*, 520 U.S. 548 (1996); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (holding courts may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Mullis*, 828 F.2d at 1388 n.9 (determining courts may take judicial notice of contents in court files in other lawsuits); *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (finding courts may take judicial notice of matters of public record outside pleadings).

### B. Second Request: Order To Show Cause

Second, in his prayer for relief, Petitioner requests an "[o]rder . . . to [s]how [c]ause" as to "why Petitioner is not entitled to the relief herein sought." Pet'r's Pet. 16. As stated earlier, Respondent filed an answer to the petition on October 2, 2009, to which Petitioner filed a traverse on December 15, 2009. Petitioner's request for an order to show cause is denied as moot.

### C. Third Request: Evidentiary Hearing

Third, Petitioner requests that the Superior Court be directed "to set the matter for an evidentiary hearing." *Id.* Here, the record shows the trial court already held an evidentiary hearing on Petitioner's suppression motion and denied it. Lodged Doc. 4, at 4-6. Additionally, as explained later, Petitioner does not allege facts that establish a colorable claim for relief. *See infra* Part VI. Petitioner's request that the Superior Court be directed to hold an evidentiary hearing is denied.

### D. Fourth Request: Appoint Counsel

Fourth, Petitioner requests appointment of counsel in further litigation of this action. Pet'r's Pet. 16. The Sixth Amendment right to counsel does not apply in habeas corpus actions.

*See Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  A district court, however, may appoint counsel to represent a habeas petitioner whenever "the court determines that the interests of justice so require," and such person is financially unable to obtain representation.  18 U.S.C. § 3006A(a)(2)(B).  The decision to appoint counsel is within the district court's discretion.  *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  Courts have made appointment of counsel the exception rather than the rule by limiting it to:  (1) capital cases; (2) cases that turn on substantial and complex procedural, legal, or mixed legal and factual questions; (3) cases involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require the assistance of experts either in framing or in trying the claims; (5) cases in which the petitioner is in no position to investigate crucial facts; and (6) factually complex cases.  *See generally* 1 J. LIEBMAN & R. HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 12.3b, at 383-86 (2d ed. 1994).  Appointment is mandatory only when the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations.  *See Chaney*, 801 F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965).

Appointment of counsel is not warranted in this case.  Petitioner's claim is a typical claim arising in a habeas petition and is not especially complex.  This is not an exceptional case warranting representation on federal habeas review.  Petitioner's request for appointment of counsel is denied.

This matter is now ready for decision.  For the following reasons, it is recommended that habeas relief be denied.

## VI.  CLAIM FOR REVIEW

The petition for writ of habeas corpus sets forth one ground for relief.  Petitioner argues that statements he made to Detective Cabral, after he was arrested, were admitted into evidence against him in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Petitioner alleges "he did not knowingly and intelligently waive his" *Miranda* right to remain silent because Detective Cabral only read the *Miranda* warnings to Petitioner in English,

1   and Petitioner was not sufficiently fluent in English to understand those rights.  Pet'r's Pet. 32.

2       A.  Legal Standard for *Miranda* Warnings

3       In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain

4   warnings must be given if a suspect's statement made during custodial interrogation is to be

5   admitted in evidence.  Once properly advised of his rights, an accused may waive them

6   voluntarily, knowingly and intelligently.  *Id.* at 475.  Voluntary means that the waiver was the

7   product of free and deliberate choice rather than intimidation, coercion or deception.  *Colorado v.*

8   *Spring*, 479 U.S. 564, 573 (1987).  Knowing and intelligent means that the defendant was aware

9   of "the nature of the right being abandoned and the consequences of the decision to abandon it."

10  *Id.*; *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

11      "Whether there has been a valid waiver depends on the totality of the circumstances,

12  including the background, experience, and conduct of defendant."  *United States v. Bernard S.*,

13  795 F.2d 749, 751 (9th Cir. 1986) (citing *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979);

14  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  "The age of the defendant is one factor in

15  applying the totality test."  *Id.* (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).  "Similarly,

16  any language difficulties encountered by the defendant are considered to determine if there has

17  been a valid waiver."  *Id.* at 751-52 (citing *United States v. Heredia-Fernandez*, 756 F.2d 1412,

18  1415 (9th Cir.), *cert. denied*, 474 U.S. 836 (1985)); *see also United States v. Gonzales*, 749 F.2d

19  1329, 1335-36 (9th Cir. 1984) (reviewing language difficulties in determining whether waiver

20  was valid); *United States v. Martinez*, 588 F.2d 1227, 1235 (9th Cir. 1978) (assuming "without

21  so holding that if *Miranda* warnings are given in a language which the person being so instructed

22  does not understand, a waiver of those rights would not be valid").

23      B.  Analysis of *Miranda* Claim

24      The last reasoned state court opinion on Petitioner's *Miranda* challenge is the California

25  Court of Appeal's decision on direct appeal.  The Court of Appeal rejected this claim, stating in

26  relevant part:

Here, the relevant considerations support the trial court's finding that [Petitioner's] ability to speak and comprehend English was sufficient to enable him to both understand his *Miranda* rights and to knowingly and intelligently waive those rights.  At the time of the interview, [Petitioner] was 36 years old and had been in the United States at least intermittently since 1992.  He had experience with the American criminal justice system.  He had been questioned by law enforcement at least three times prior to his arrest in this case, and in each instance he was advised of his *Miranda* rights in English, Spanish, or both; indicated that he understood his rights; and agreed to waive them.  Deputy Farley's testimony that [Petitioner] indicated he could not read the "*Miranda* sheet" written in English suggests that [Petitioner] would have asked for clarification if he did not understand his rights when Deputy Davis, Deputy Farley, or Detective Cabral read them to him in English.  Moreover, while neither Deputy Davis nor Deputy Farley spoke Spanish, both were able to communicate with [Petitioner] in English.

The transcript of the interview also supports the trial court's finding that [Petitioner] understood and voluntarily waived his *Miranda* rights.  Before Detective Cabral advised [Petitioner] of his *Miranda* rights, he asked [Petitioner] several questions in English that [Petitioner] answered appropriately.  In particular, Cabral asked [Petitioner] if he understood "English pretty good," and [Petitioner] assured him that he did.  After [Petitioner] demonstrated his ability to understand and communicate in English, Cabral advised him of his *Miranda* rights.  When asked whether he understood those rights, [Petitioner] indicated that he did.  Cabral then asked whether [Petitioner] wanted to speak with him, and [Petitioner] again indicated that he did.

We reject [Petitioner's] assertion that Detective Cabral "form[ed] the impression that [Petitioner] could not understand English, because Cabral began relying upon his Spanish only a few questions after [Petitioner's] rights were given in English."  When asked why he "switched over" to Spanish, Cabral explained that [Petitioner] began responding in Spanish and appeared to be more comfortable conversing in Spanish.  Cabral's explanation is supported by the transcript of the interview, which shows that he began questioning [Petitioner] primarily in Spanish only after [Petitioner] began responding primarily in Spanish.  That [Petitioner] was more comfortable speaking Spanish does not mean he did not understand English.  Indeed, while the interview was conducted primarily in Spanish, at points Cabral reverted to English and [Petitioner] responded appropriately in both English and Spanish.  For example, when asked how many times he hit Steve with the bat, [Petitioner] responded, "Maybe three."  When asked whether he hit Elena "[a]ll in the head," he responded, "No, I think only here."  When asked "which girl did you hit like that," he responded, "Maybe . . . Elena's girl."  Moreover, when Cabral

reverted back to English, he asked [Petitioner], "Do you understand me in English," and [Petitioner] responded, "Uh-huh."

That [Petitioner] had some difficulty with English does not preclude a finding that his ability to speak and comprehend English was sufficient to understand his rights and to validly waive them. (*Bernard S.*, 795 F.2d at p. 752; see also *Campaneria v. Reid* (2d Cir. 1989) 891 F.2d 1014, 1020 [the defendant's limited proficiency in English did not prevent him from making a knowing and intelligent waiver of his constitutional rights].)  Although [Petitioner] sometimes spoke in broken English with an accent and appeared to be more comfortable speaking Spanish, the record amply supports the trial court's finding that his command of English was sufficient for him to have understood the *Miranda* warnings given to him.

[Petitioner's] reliance on the decision of the Ninth Circuit Court of Appeals in *U.S. v. Garibay* (9th Cir. 1998) 143 F.3d 534 is misplaced.  There, the court reversed the trial court's finding that the defendant made a knowing and intelligent waiver of his *Miranda* rights because, among other things, the defendant was a person of low intelligence, with no experience in the criminal justice system, whose native language was Spanish, and who produced independent evidence of his inability to understand English.  (See *id.* at pp. 538-539.)  As [Petitioner] concedes, the facts of this case are not "as overwhelming as [those in] the *Garibay* case."  Indeed, [Petitioner] is a person with experience in the criminal justice system, whose native language is Spanish but who speaks responsively and intelligently in English, and who produced no independent evidence of an inability to understand and speak English.  Nor is there any indication in the record that he does not possess at least average intelligence.

Lodged Doc. 4, at 7-9.

Here, the record shows Petitioner spoke adequate English.  Petitioner spoke in English to Detective Cabral from the moment Detective Cabral encountered Petitioner.  Clerk's Tr. vol. 1, 162.  Detective Cabral had no difficulty understanding Petitioner's English throughout the interview, and Petitioner did not appear to have trouble understanding Detective Cabral.  *See, e.g.*, *id.* at 171 (showing Petitioner discussed how he "broke this finger" in English); *id.* at 198 (revealing Petitioner spoke in English about how murder victim paid Petitioner in stolen checks); *id.* at 264 (showing Petitioner responded to Detective Cabral's question, asked in English, after they conversed in Spanish); *id.* at 266 (same); *id.* at 289-94 (same).  Although English is

Petitioner's second language, he did not show he was unable to communicate effectively in English.

Further, the record shows Petitioner received and waived his *Miranda* rights:

> DET. CABRAL:  Like I said, my name's Dan Cabral.  I work here with the sheriff's department, our homicide bureau.  Okay?  Before we start, uh, to talk about anything, you understand English pretty good?
>
> MR. OROSCO:  Yeah.
>
> DET. CABRAL:  Okay.
>
> DET. CABRAL:  If there's something you don't understand, let me know so I -- we can make it clear so you understand me.  Okay?
>
> MR. OROSCO:  Okay.
>
> DET. CABRAL:  I do speak Spanish.  However, I understand better than I can speak it.
>
> MR. OROSCO:  I understand, man.
>
> DET. CABRAL:  Okay.  Okay, so together like I'm sure we can work it out, okay?
>
> MR. OROSCO:  Okay.  You the lawyer?  Something?
>
> DET. CABRAL:  No -- no.  I'm a detective.
>
> MR. OROSCO:  Oh.
>
> DET. CABRAL:  I'm a detective.  Uh, I think earlier today you talked to, uh, our sergeant, Craig Hill.  Un güero. [A white guy.]
>
> MR. OROSCO:  Uh-huh.
>
> DET. CABRAL:  Okay.  Um, he -- yeah, he called me and said, "Hey, we got some things going on.  Can you come down and help?"  So I'm here to help them out.  Okay.  Uh, you know -- you understand you're under arrest?
>
> MR. OROSCO:  Uh-huh.
>
> DET. CABRAL:  Okay.  Before I start to ask you anything, basically, what I've gotta do is cover a few things.  Uh, first of all, we definitely wanna get your side of the story as to what happened, okay?  I think it's real important for everybody.  Okay.  But before I continue, what I have to do is read you your Miranda

1   advisements.

2   MR. OROSCO:  Oh.

3   DET. CABRAL:  Okay?  And have you been arrested before?

4   MR. OROSCO:  Yeah.

5   DET. CABRAL:  Okay.  And are you familiar with Miranda?

6   MR. OROSCO:  No.  Just por [for] ticket there.  Por [For] -- I just
7   coming por violencia doméstica [for domestic violence] two
    months.

8   DET. CABRAL:  Okay.

9   MR. OROSCO:  Only two months.

10  DET. CABRAL:  Okay.

11  MR. OROSCO:  One month.

12  DET. CABRAL:  Okay, this is something we -- we've gotta do.
    It's kind of your rights, okay?  I'm gonna read them to you, okay?
13  And let me know if you understand them.  Okay?  You have the
    right to remain silent.  Anything you say, can be used against you
14  in a court of law.  You have the right to talk to an attorney and
    have an attorney present before and during questioning.  If you
15  cannot afford an attorney, one will be appointed free of charge to
    represent you before and during questioning if you desire.  Do you
16  understand each of these rights that I have explained to you?

17  MR. OROSCO:  (No Audible Response)

18  DET. CABRAL:  Yes or no?

19  MR. OROSCO:  Yes.

20  DET. CABRAL:  Okay, having these rights in mind, do you wish
    to talk to me?
21
    MR. OROSCO:  (No Audible Response)
22
    DET. CABRAL:  Okay.  That's a yes or no?
23
    MR. OROSCO:  Yeah.  Yes.
24

25  *Id.* at 164-67.  During the interview, Petitioner never indicated that he did not understand his

26  rights, nor did Petitioner ask for clarification about his rights.  Petitioner also never asked for a

13

lawyer, and never indicated an unwillingness to talk to the police.  Petitioner was even willing to

speak with Detective Cabral again if needed:

> DET. CABRAL:  If I need to talk to you again, are you willing to talk to me?
>
> MR. OROSCO:  Uh-huh.
>
> DET. CABRAL:  If I need to talk to you tomorrow or Monday?
>
> MR. OROSCO:  Uh-huh.
>
> DET. CABRAL:  ¿Puedo hablar contigo otra vez?  [Can I talk to you again?]
>
> MR. OROSCO:  Sí -- sí, cuando quiera.  Pues, yo voy a decir lo mismo.  [Yes -- yes, whenever you want.  Well, I'm going to say the same thing.]

Clerk's Tr. vol. 5, 1377.  The evidence indicates that, despite Petitioner's accent and switch

between English and Spanish, Petitioner understood his rights and voluntarily, knowingly, and

intelligently waived them.  *See Bernard S.*, 795 F.2d at 752 (determining substantial evidence

supported finding that seventeen year-old with limited English proficiency understood and

validly waived his *Miranda* rights).

Moreover, "[t]he erroneous admission of statements taken in violation of a defendant's

Fifth Amendment rights is subject to harmless error."  *Ghent v. Woodford*, 279 F.3d 1121, 1126

(9th Cir. 2002) (citing *Neder v. United States*, 527 U.S. 1, 18 (1999)).  On collateral review, the

test is "whether the error 'had substantial and injurious effect or influence in determining the

jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citing *Kotteakos v. United

States*, 328 U.S. 750, 776 (1946)); *see also Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000)

(determining *Brecht* standard applies uniformly in all federal habeas corpus cases under § 2254).

Here, the State's evidence against Petitioner was overwhelming.  The police were

dispatched to the crime scene and encountered several victims, including Ulla Norlie, Kristena

Norlie, Cynthia J., Miguel Araiza, and Steven Heasely.  Rep.'s Tr. vol. 2, 284-85, 302-03.  Ulla

was "covered with blood," *id.* at 284; the two children, Kristena and Cynthia, also "had blood

coming from their head," *id.* at 302; Araiza was injured, *id.* at 285; and Heasely's clothes appeared to be soaked in blood. *Id.* at 304. Several people, including Ulla, Araiza, and "a citizen," pointed the police to Petitioner, who the police found near the crime scene "covered in blood." *Id.* at 286, 303. The police "notice[d] a baseball bat with blood on it in plain view and a nail gun or staple gun." *Id.* at 306. At trial, four of the victims testified against Petitioner, as well as other eye witnesses. The State's physical evidence and eyewitness testimony were so persuasive that Petitioner cannot show that the admission of his custodial statements had any substantial effect on the jury's verdict. Habeas relief cannot be granted on this claim.

VII.   CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Petitioner's requests for judicial notice of the record in *People v. Orosco*, Superior Court Case No. 04F06886, Court of Appeal Case No. C051676, and California Supreme Court Case No. S153939, is GRANTED;

2. Petitioner's request for an order to show cause is DENIED as moot;

3. Petitioner's request for an order directing the Superior Court to set the matter for an evidentiary hearing is DENIED; and

4. Petitioner's request for appointment of counsel is DENIED.

IT IS HEREBY RECOMMENDED that Petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order.

*Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should be issued in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or deny certificate of appealability when it enters final order adverse to applicant).

DATED:        November 29, 2010.


TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

16